[No. F037422. Fifth Dist. Nov. 25, 2002.]

SUSAN WANGER, Plaintiff and Appellant, v.
EMC MORTGAGE CORPORATION, Defendant and Respondent.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I., II., III., V., VI., and VII. of DISCUSSION.

**Counsel**

John L. Flowers for Plaintiff and Appellant.

Rosenthal, Withem & Zeff, Michael L. Withem and Matthew D. Reinstein for Defendant and Respondent.

**Opinion**

**GOMES, J.**—Appellant Susan Wanger appeals from the grant of summary judgment in favor of the mortgage company that foreclosed upon real estate that secured her loan. Wanger contends triable issues of material fact exist concerning her claims for breach of contract, negligence, violation of statutory duties, and interference with prospective economic advantage. We agree and reverse judgment.

### PROCEDURAL BACKGROUND

Wanger filed a complaint on January 28, 1998, to set aside the trustee's sale of a single-family residential real estate located on West Alluvial Avenue in Fresno, California (the Property). After a series of demurrers, on November 22, 1999, Wanger filed her fifth amended complaint against respondent EMC Mortgage Corporation (EMC) and others. The fifth amended complaint alleges claims for breach of contract, negligence, violation of statutory duties, and interference with prospective economic advantage.

On August 21, 2000, EMC filed a motion for summary judgment or in the alternative summary adjudication, a separate statement of undisputed facts, and supporting declarations. On September 8, 2000, Wanger filed an opposition to the motion for summary judgment, a response to EMC's separate statement, and supporting declarations. On September 15, 2000, EMC filed evidentiary objections to the declaration of Wanger and to exhibits A through Q attached to the declaration of her attorney.

The court issued a written tentative ruling granting the motion for summary judgment. Wanger did not request oral argument. On September 21, 2000, the superior court adopted its tentative ruling as the order of the court and sustained EMC's evidentiary objections to five documents attached as exhibits D, G, K, M and Q to the declaration of Wanger's attorney. Wanger filed a timely notice of appeal.

FACTUAL BACKGROUND

In 1991, Wanger obtained a loan from First California Mortgage Company (First California)[1] and signed a promissory note and a deed of trust on the Property. In October 1993, Wanger and First California discussed a loan modification reducing the interest rate and the monthly payments. A modification document was sent to Wanger, which she signed and returned to First California. Wanger thought that the modification had become effective, but uncertainty arose as to whether the modification was effective. Part of this uncertainty appears to have been caused when First California was unable to locate the loan file.

First California eventually took the position that the modification was not effective. Wanger had not been making monthly payments under the loan and, based on the original loan terms, First California claimed $26,616.96 was owed. Wanger paid $24,999.35 by cashier check on February 3, 1995, but continued to dispute the amount owed and claimed violations of the Real Estate Settlement Procedures Act of 1974 (RESPA), as amended, 12 United States Code section 2601 et seq. Also, in February 1995, Wanger leased the Property to a husband and wife and, presumably, she had moved from the Property before renting it.

In April 1995, Wanger asserts she reached an agreement with First California to resolve her claims. Under the agreement, First California was to credit the sum of $7,352.75 against her loan and Wanger was to commence regular monthly payments of $1,470.55 on June 1, 1995. From July through November of 1995, Wanger claims she sent her monthly mortgage payments to First California.

In the meantime, First California sold Wanger's loan to EMC. The transfer was effective on April 17, 1995. Both First California and EMC sent notice of the transfer to Wanger at the Property address. However, Wanger had moved to Washington and did not receive these notices. In an April 14, 1995, letter, Wanger had notified First California of her new mailing address in Seattle.

In September 1995, Wanger deeded the Property to her daughter, Lisa Marie Keller. In her deposition testimony, Wanger testified Keller was the executor of her estate and she transferred title to the Property to Keller for estate planning purposes.

---

[1]For purposes of this opinion, we refer to First California Mortgage Company and Mortgage Service America Co., a company with which it appears to have merged, as First California.

In December 1995, EMC caused the law firm acting as trustee under the deed of trust to file a notice of default. Wanger states she first learned of EMC and its rights as assignee of the note and deed of trust on December 9, 1995, when she received a notice of trustee's sale from the trustee. As a result of Wanger's communications with the trustee, this notice of trustee's sale was rescinded. Also in December, Wanger obtained the eviction of the tenants who had stopped paying rent, and she listed the Property for sale with a real estate broker.

During 1996 and 1997, Wanger and EMC were not able to settle their dispute. EMC resumed nonjudicial foreclosure proceedings. A notice of default was recorded on September 16, 1997. EMC purchased the Property with a credit bid at the January 13, 1998, trustee's sale. Two weeks later, Wanger began her lawsuit against EMC and the trustee. The law firm that acted as trustee under the deed of trust settled with Wanger in June 1999 and is no longer involved in this lawsuit.

DISCUSSION

I.-III.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

IV.  *Violation of the Notice of Transfer Requirements of RESPA*

A.  *Statutory and Regulatory Background*

RESPA[8] originally was enacted to (1) produce more effective advance disclosure of settlement costs to home buyers and sellers; (2) eliminate kickbacks and referral fees that tended to increase the cost of real estate settlement services; (3) reduce the sums homeowners were required by lenders to place in escrow accounts to ensure payment of real estate taxes and insurance; and (4) reform and modernize local recordkeeping of land title information. (§ 2601(b)(1)-(4); Annot., Construction and Application of Real Estate Settlement Procedures Act of 1974 (1997) 142 A.L.R.Fed. 511.) Regulation X (24 C.F.R. § 3500.1 et seq. (2002)) was promulgated by the Secretary of the United States Department of Housing and Urban Development (HUD) as the implementing regulation for RESPA.

In 1989, "the United States General Accounting Office . . . conducted a major study of mortgage loan servicing practices . . . and uncovered a

---

*See footnote, *ante*, page 1125.

[8]All further undesignated statutory references are to title 12 of the United States Code unless otherwise indicated.

substantial number of consumer complaints on abusive lender practices. These complaints involved such wide-ranging concerns as mistakes in calculating escrow account payments, unresponsiveness to inquiries, failure to make timely property tax and hazard insurance premium payments, and failure to provide adequate notice of a mortgage loan servicing transfer. The complaints also pointed out that these errors can potentially result in the imposition of late payment charges and payments to the wrong parties." (Lee & Mancuso, *Housing Finance: Major Developments in 1989* (1990) 45 Bus. Law. 1863, 1870-1871, fn. omitted.)

As a result, section 941 of the voluminous Cranston-Gonzalez National Affordable Housing Act of 1990 (Pub.L. No. 101-625 (Nov. 28, 1990) 104 Stat. 4079, 4405) amended RESPA by adding a new section 2605 requiring the servicer[9] of certain real estate loans[10] to (1) notify the borrower when the loan is transferred to another servicer and (2) respond to written inquiries[11] from the borrower. (Maurer, *Using RESPA to Remedy Erroneous ARM Adjustments* (1995) 49 Consumer Fin. L.Q. Rep. 115.)

The notification provision in section 2605(b)(1) states "[e]ach servicer of any federally related mortgage loan *shall notify* the borrower in writing of any assignment, sale, or transfer of the servicing of the loan to any other person." (Italics added.) Regulation X provides that "each transferor servicer and transferee servicer of any mortgage servicing loan *shall deliver* to the borrower a written Notice of Transfer, containing" the required information about the servicer and the transfer. (24 C.F.R. § 3500.21(d)(1)(i) (2002), italics added.)

▮▮▮ In this case, the specific issue presented is whether the notice of transfer requirements contained in RESPA and Regulation X (§ 2605; 24 C.F.R. § 3500.21 (2002)) were violated when EMC mailed the notice of transfer to the address shown on the note and the deed of trust. The briefs filed by the parties did not cite any published case, regulation or treatise construing section 2605(b)(1) to determine what is adequate delivery of a notice of servicing transfer. Pursuant to Government Code section 68081, we requested supplemental letter briefs from the parties addressing whether the language of RESPA and Regulation X governing notice of servicing transfers requires "(a) actual receipt by the borrower, (b) delivery based on the servicer's constructive knowledge of borrower's address, (c) delivery based

---

[9]"Servicer" is defined as the person responsible for servicing the loan and may include the person who made or holds the loan if that person also services the loan. (§ 2605(i)(2).)

[10]RESPA covers "federally related mortgage loans," a very broad concept defined in section 2602(1).

[11]A servicer's duty to respond is triggered by receipt of a "qualified written request," a term defined in section 2605(e)(1)(B).

on the servicer's actual knowledge of borrower's address or (d) some other standard." After receipt of the supplemental letter briefs, it still appears we are faced with an issue of first impression.[12]

B. *Facts*

1. *Undisputed Facts from EMC's Separate Statement*

On March 22, 1995, First California mailed a letter addressed to Wanger at the Property address advising her that the servicing of her loan would be transferred to EMC. Effective April 17, 1995, EMC acquired Wanger's loan from First California and began servicing the loan. On May 2, 1995, EMC mailed a letter to Wanger at the Property address stating that the servicing of the loan had been transferred to EMC.

EMC's separate statement refers to a letter dated April 14, 1995, that Wanger sent to First California. In the letter, Wanger confirmed her purported agreement with Bill Berrong of First California to settle her damages claim and stated she would commence regular loan payments on June 1, 1995, in the amount of $1,470.55. The body of the letter also contains Wanger's new mailing address in Seattle, Washington.

The promissory note and the deed of trust executed by Wanger on December 24, 1991, are included in the exhibits referenced as supporting evidence in EMC's separate statement. Paragraph 7 of the December 24, 1991, promissory note provides:

"Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

"Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given notice of that different address."

Similarly, paragraph 14 of the deed of trust provides: "Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use

---

[12]Our letter requesting supplemental briefs suggested counsel might find it helpful to discuss the legal questions with RESPA attorneys at the Office of General Counsel of HUD. This suggestion did not lead to the identification of controlling legal authority.

of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower."

### 2. *Undisputed Facts from Wanger's Separate Statement*

Wanger did not receive the notice of transfer letter from First California or the notice of transfer letter from EMC.

Wanger contends EMC knew its notice of transfer was not delivered because the United States Postal Service returned the envelope containing the notice. However, the superior court sustained EMC's evidentiary objection to a photocopy of that envelope, exhibit G to the declaration of Wanger's former attorney.[13] The envelope bore the notation "forwarding order expired" and a return postmark of May 8, 1995.

### C. *Legal Contentions of Wanger and EMC*

Wanger's supplemental letter brief contends her letter dated April 14, 1995, provided First California with a "revised address" as that term is used in section 3500.11[14] of Regulation X and that EMC, as First California's successor in interest, either had actual knowledge of the revised address or, at least, had constructive knowledge of the revised address. As a result of this actual or constructive knowledge, Wanger asserts EMC was required to use her revised address in Washington when mailing the notice of transfer.

In contrast, EMC's supplemental letter brief contends mailing the notice to the Property's address was adequate delivery because (1) it was in accordance with the procedures for giving notice set forth in the written agreement of the parties, (2) the notice of servicing transfer in this instance is of no importance because Wanger deeded away the Property four months later, and (3) Wanger had ample notice of the foreclosure sale conducted in January of 1998. EMC asserts the provisions of the written agreements

---

[13]Because our analysis is not dependent upon whether or not the envelope containing the notice of transfer was returned to EMC, we do not address whether the superior court abused its discretion in sustaining the objection. The declaration of Wanger's former attorney did not explain how he obtained a copy of the envelope.

[14]Section 3500.11 of Regulation X relates to mailing and provides: "The provisions of this part requiring or permitting mailing of documents shall be deemed to be satisfied by placing the document in the mail (whether or not received by the addressee) addressed to the addresses stated in the loan application or in other information submitted to or obtained by the lender at the time of loan application or submitted or obtained by the lender or settlement agent, except that a revised address shall be used where the lender or settlement agent has been expressly informed in writing of a change in address." (24 C.F.R. § 3500.11 (2002).)

regarding notice are consistent with the notice requirements of Civil Code section 2937 concerning transfers of loan servicing that states that notices "shall be sent by first-class mail, postage prepaid, to the borrower's or subsequent obligor's address designated for loan payment billings . . . ." (*Id.*, subd. (d).)

### D. *Determination of the Legal Rule*

Statutes should be construed in accordance with the plain meaning of the statutory language. The phrase "shall notify" does not have a plain meaning. The provisions of RESPA do not make its meaning plain by defining notify or notice. Nor are those terms defined by the provisions of Regulation X that address mortgage servicing transfers. (24 C.F.R. § 3500.21 (2002).)

Notwithstanding the lack of definitions for these terms, the language that a servicer "shall notify the borrower in writing" does exclude the statutory construction requiring actual receipt by the borrower. Had Congress intended actual receipt by the borrower, it would have said so. For example, under section 2605(e)(1)(A), a servicer's duty to respond to a borrower inquiry arises when the servicer "receives a qualified written request." Similarly, under the Truth in Lending Act (TILA), 15 United States Code section 1601 et seq., a credit card company's obligation to respond to a customer's written inquiry about a billing error is triggered if it *receives* the inquiry within 60 days after transmitting the account statement to the customer. (15 U.S.C. § 1666(a).) Thus, when Congress intends to require receipt, it uses language that plainly expresses that intent.

In Regulation X, HUD has interpreted the statutory notification provision to mean that a servicer "shall deliver to the borrower a written Notice of Transfer." (24 C.F.R. § 3500.21(d)(1)(i) (2002).) Neither RESPA nor section 3500.21 of Regulation X defines deliver or delivery. (24 C.F.R. § 3500.21 (2002).) Also, section 3500.11 of Regulation X concerning mailing did not become effective until April 25, 1996. (61 Fed.Reg. 13232, 13239 (Mar. 26, 1996).) However, HUD has defined "delivery" in the regulation concerning the requirements RESPA places on escrow accounts established or controlled by a servicer. In that context, delivery means "the placing of a document in the United States mail, first-class postage paid, addressed to the last known address of the recipient" or hand delivery. (24 C.F.R. § 3500.17(b) (2002).) Under Regulation X, a servicer that maintains an escrow account in connection with a federally related mortgage must deliver initial and annual escrow account disclosure statements to the borrower. (See 24 C.F.R. § 3500.17(m)(1) (2002).)

In the absence of direct authority, we interpret the requirement for delivery of a notice of the transfer of mortgage servicing by analogy to the

delivery requirements in section 3500.17 of Regulation X. (24 C.F.R. § 3500.17 (2002).) The regulations governing escrow account disclosure statements provide some insight into what HUD regards as adequate notice in a related area. Thus, we conclude the notice of transfer requirements of section 2605 and Regulation X (24 C.F.R. § 3500.21(d)(1)(i) (2002)) required EMC to place the notice "in the United States mail, first-class postage paid, addressed to the last known address of" Wanger. (24 C.F.R. § 3500.17(b).)

This construction of the statute and regulation does not end our inquiry because Regulation X does not define the concept of a "last known address" or otherwise indicate whether the determination of the address is limited to the actual knowledge of the loan servicer or includes constructive knowledge.[15] To answer this question, we look to the purposes underlying RESPA generally and the notice of transfer provisions of section 2605.

If RESPA and section 2605 are remedial consumer protection statutes, they should be construed liberally to best serve Congress's intent. (*Ellis v. General Motors Acceptance Corp.* (11th Cir. 1998) 160 F.3d 703, 707 [liberally construing TILA, a remedial consumer protection statute]; *Jackson v. Grant* (9th Cir. 1989) 890 F.2d 118, 120 [9th Cir. liberally construes TILA].)

As to RESPA generally, we conclude it is a remedial consumer protection statute. The analysis of the district court in *Rawlings v. Dovenmuehle Mortg., Inc.* (M.D.Ala. 1999) 64 F.Supp.2d 1156 is convincing. The district court concluded RESPA was remedial and protective based on (1) the language of the statute, (2) the legislative history and (3) the decisions of other courts construing RESPA as a consumer protection statute. (*Rawlings*, at pp. 1165-1166; see *Patton v. Triad Guar. Ins. Corp.* (11th Cir. 2002) 277 F.3d 1294, 1299.) An additional basis for this conclusion is that HUD, the agency responsible for implementing RESPA, often refers to RESPA as a consumer protection statute. (E.g., 61 Fed.Reg. 69055, 69056 (Dec. 31, 1996) [disclosures required should be designed to meet consumer protection goals of RESPA]; 61 Fed.Reg. 29238, 29241 (June 7, 1996) [refers to "RESPA's core objective of consumer protection"].)

As to section 2605, we agree with those courts that conclude it is a remedial consumer protection statute. (Cf. *Ploog v. HomeSide Lending,*

[15]Some statutes specifically address whether the concept of last known address includes actual or constructive knowledge. For instance, Civil Code section 2924b, subdivision (b)(3) states " 'last known address' . . . means the last business or residence address actually known by the . . . person authorized to record the notice of default."

*Inc.* (N.D.Ill. 2002) 209 F.Supp.2d 863, 870 ["actual damages" under § 2605(f)(1) include recovery for emotional distress]; *Johnstone v. Bank of America, N.A.* (N.D.Ill. 2001) 173 F.Supp.2d 809, 815 [same]; *Rawlings v. Dovenmuehle Mortg., Inc., supra*, 64 F.Supp.2d 1156 [same] with *Katz v. Dime Sav. Bank, FSB* (W.D.N.Y. 1997) 992 F.Supp. 250, 255-256 [§ 2605 not a consumer protection statute and, therefore, emotional distress not recoverable as actual damages].)[16]

The concept of consumer protection has many facets. Consumers may be protected by receipt of information that allows them to make decisions that are better informed. (See § 2601(a), (b)(1).) Consumers also are protected by measures that reduce the cost of credit. (See § 2601(a), (b)(2).) We recognize there is some tension between providing information to facilitate consumer decisionmaking and reducing the cost of credit because construing section 2605 in a manner that increases the burden on loan servicers may result in that burden being passed on to consumers in the form of higher credit costs.

The level of responsibility imposed upon a servicer to provide notice of a transfer must reflect these general, sometimes conflicting, consumer protection purposes of RESPA as well as address the particular evils the notice of transfer provisions of section 2605 were designed to ameliorate, i.e., late charges being incurred and loan payments being made to the wrong party because the borrower is unaware the servicing of the loan has been transferred. Requiring the servicer to determine the last address of the borrower based on the servicer's actual knowledge would minimize cost. However, requiring a servicer to exercise reasonable care and diligence in determining the correct address of the borrower would decrease the number of notices of transfer sent to the wrong address. In balancing these considerations, we conclude the last known address of the borrower shall be determined with reference to the servicer's actual and constructive knowledge. In other words, a servicer must exercise reasonable care and diligence in determining the correct address of the borrower when mailing a notice of transfer.

This view of the concept of a last known address is not unique. Other courts, in different contexts, have ruled a last known address may be determined based on constructive knowledge. (E.g., *In re Smith* (3d Cir. 1989) 866 F.2d 576, 586 [Pennsylvania foreclosure statute requires notice to last known address which courts construe as requiring a good faith effort to ascertain the current address of the mortgage debtor]; *U.S. West Properties, Inc. v. AOI Compwise Worker's Compensation Program* (1998) 156 Or.App.

---

[16]We express no view on the underlying question of whether emotional distress is included in actual damages recoverable by a borrower under section 2605(f)(1)(A).

411 [965 P.2d 467] [statute requires notice of cancellation of insurance to be sent to last known address of employer-insured; notice could be sent to address listed in policy unless insurer "knew or had constructive knowledge of [insured's] new address"].)

E.  *Application of Legal Rule to the Undisputed Facts*

EMC has failed to establish that it had no actual knowledge of Wanger's Seattle, Washington address and that it would not have obtained this knowledge through the exercise of reasonable care and diligence. The letter dated April 14, 1995, which contains the new address, is among the evidence referenced by EMC in its separate statement, but we cannot determine when EMC knew or should have known the contents of the letter.

First, with respect to actual knowledge, an issue of fact exists as to the contents of the loan file in EMC's physical possession. The undisputed facts do not establish whether or not Wanger's Washington address was in the file in EMC's physical possession before it mailed the notice of transfer. (See *In re Smith, supra,* 866 F.2d at p. 586 [Pennsylvania foreclosure statute required notice to last known address; lender's files definitely contained information that borrower was not residing at the property].)

Second, with respect to the constructive knowledge, underlying factual issues exist as to (1) the scope of what EMC should have searched and (2) the information that would have been learned by conducting a search within that scope. As to the scope of the inquiry required by reasonable care and diligence, a reasonable trier of fact might find the scope of inquiry is limited to a search for a written notice of change of address because of the notice provisions in the deed of trust. However, a broader scope of inquiry might be warranted by the surrounding facts and circumstances. For example, a servicer might be found to have knowledge of a new address received by e-mail or orally in a telephone conversation, particularly if the servicer caused the borrower to believe such a notice was adequate.

Furthermore, even if the scope of a reasonable inquiry was limited to a search for a written change of address notice, the undisputed facts do not show that EMC would not have found Wanger's new address. Wanger may be able to show that, in light of the risk that a change in address notice received by a servicer transferring a loan around the time of the transfer might not be included in materials physically transferred to a servicer acquiring the loan, reasonable care and diligence requires a servicer acquiring the loan to implement a procedure to cause such a notice of change in address to reach it. If Wanger is able to show reasonable care and diligence

would have led to EMC's reviewing First California's files for such a notice, then she may also be able to show EMC would have discovered her new address contained in the April 14, 1995, letter.

In light of the foregoing, the undisputed facts do not support finding as a matter of law that the last address of Wanger actually known by EMC, or that should have been known by EMC through the exercise of reasonable care and diligence, was the Property address. Accordingly, EMC's attempt to provide Wanger with the notice of transfer may have failed to comply with RESPA. Thus, Wanger's RESPA cause of action survives the motion for summary adjudication.

F. *Actual Damages Recoverable Under RESPA Are Not Limited to the Foreclosure*

EMC presents three straw man arguments in an attempt to convince us it has knocked down Wanger's RESPA cause of action. The straw man, i.e., erroneous premise, is that the RESPA cause of action is solely a claim for wrongful foreclosure. First, EMC argues that the RESPA cause of action cannot survive unless the foreclosure was wrongful. Second, EMC argues any failure to give notice of transfer of servicing is of no importance because Wanger deeded the Property away four months later. Third, EMC argues it is not liable under RESPA because Wanger had ample notice of the foreclosure sale conducted in January of 1998.

We reject these arguments because one reason the alleged violation of RESPA is a separate cause of action is that it is based upon separate and distinct wrongful acts, i.e., the alleged failure to give the statutorily required notice of transfer. (See 6 Witkin, Cal. Procedure (4th ed. 1997) Proceedings Without Trial, § 242, p. 657.) Wanger's recovery of actual damages under section 2605(f)(1) and attorney fees under section 2605(f)(3) is not dependent upon proving the foreclosure was wrongful, although the foreclosure might be among the actual damages.

Actual damages may include, but are not limited to, (1) out-of-pocket expenses incurred dealing with the RESPA violation, (2) lost time and inconvenience to the extent it resulted in actual pecuniary loss, and (3) late fees. (See *Johnstone v. Bank of America, N.A., supra,* 173 F.Supp.2d at pp. 813-814, 816; *Rawlings v. Dovenmuehle Mortg., Inc., supra,* 64 F.Supp.2d at p. 1164 [$115 spent on photocopies, secretarial work, and travel to post office recoverable under § 2605(f)(1)].) Also, Wanger might be able to show the monthly payments made to First California after the effective date of the transfer are actual damages.

The issue of whether or not the foreclosure is included in the actual damages suffered by Wanger will depend upon her showing that the foreclosure occurred "as a result of the failure" (§ 2605(f)(1)(A)) to deliver the notice of transfer. (See *Johnstone v. Bank of America, N.A., supra,* 173 F.Supp.2d at pp. 813-814 [complaint alleged sufficient causal connection between RESPA violation and foreclosure to withstand a motion to dismiss].) The issue of causation was never addressed in EMC's separate statement and, therefore, cannot provide an undisputed factual basis for eliminating Wanger's RESPA theory of liability.

Lastly, we reject EMC's argument that the remedy envisioned by section 2605 for a failure to provide a notice of transfer is sending the servicer a qualified written request under section 2605(e) because it is contrary to the plain language of the statute. Section 2605(f) provides that "[w]hoever fails to comply with any provision of this section shall be liable to the borrower" for actual damages. The phrase "any provision of this section" plainly includes the provisions contained in section 2605(c) concerning notices by transferees of loan servicing.

V.-VII.*

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

## Disposition

The judgment is reversed and the matter is remanded to the trial court with directions to vacate its order granting summary judgment in favor of EMC. Wanger shall recover her costs on appeal.

Ardaiz, P. J., and Cornell, J., concurred.